**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

JOSE LUIS AISPURO and HUMBERTO
ROMAN HERNANDEZ,

    Defendants.

No. 06 CR 871
Judge James B. Zagel

**MEMORANDUM OPINION AND ORDER**

On November 29, 2006, a criminal complaint was filed against both Jose Luis Aispuro and Humberto Roman Hernandez, charging Defendants with violations of 21 U.S.C. § 846 on or about November 28, 2006. The grand jury returned a four-count indictment charging Aispuro and Hernandez with conspiring to possess with intent to distribute a controlled substance (Count 1), and with knowingly and intentionally possessing with intent to distribute a controlled substance (Count 2). Aispuro was charged in a separate count with knowingly and intentionally possessing with intent to distribute a controlled substance (Count 4).[1] Count 2 refers to the approximately twelve kilograms of cocaine found in the car that Hernandez was driving on November 28, 2006. Count 4 refers to the approximately 127 kilograms of cocaine found at 3401 N. Nordica and 3601 N. Nordica in Chicago, Illinois. Aispuro and Hernandez have filed motions to quash arrest and suppress evidence.

---

[1]Count 3 charged a third defendant, Hugo Roeldy Revolorio, with knowingly and intentionally attempting to possess with intent to distribute a controlled substance. Revolorio has filed no motions.

## I.    Factual Background [2]

At 8:00 a.m. on November 28, 2006, agents from the Federal Drug Enforcement Agency were conducting surveillance on the residence of 3601 N. Nordica, Chicago, Illinois. Previously, the DEA obtained intelligence that a cellular telephone, registered to Miguel Anaya Fuentes of 3401 N. Nordica, was being used to facilitate illegal drug transactions. Further research revealed Fuentes also resided at 3601 N. Nordica in Chicago, Illinois. DEA Agents also had information that a white Ford Explorer registered to Ascencion Garcia at an address on Montrose Avenue in Chicago was linked to the drug transactions. At around 12:20 p.m. on November 28, 2006, agents observed a Hispanic male, wearing a red jacket and blue jeans and later identified as Defendant Jose Luis Aispuro, exit 3601 N. Nordica and enter into that white Ford Explorer. Agents observed Aispuro drive the Explorer two blocks and then park on the street outside the residence located at 3401 N. Nordica. At that time, Aispuro exited the Explorer and entered 3401 N. Nordica. Another car registered to Ascension Garcia, a green Monte Carlo, was also parked on the street in front of 3401 N. Nordica.

At approximately 12:58 p.m., agents observed Aispuro leave 3401 N. Nordica, enter into the same white Explorer, and drive southbound on Harlem Avenue. Agents followed Aispuro down Harlem Avenue and observed Aispuro talking on his cell phone as he approached North Avenue.[3] Aispuro entered the center turn as if to turn into the Sears parking lot on the left.

---

[2]The following findings of fact were established at a suppression hearing held on March 11, 2008 and March 12, 2008. The government called Agents Sam Gannelli, Tom Asselborn, Brett Williams, and Brian O'Neill to testify at the hearing. Defendants called no witnesses.

[3]The agents participating in the investigation remained in radio contact throughout the day.

Another man, standing in the Sears Automotive parking lot across the street (to Aispuro's right), was gesturing towards Aispuro to turn that way instead. Aispuro turned out of the center lane, cut across Harlem Avenue, and turned right into the Sears Automotive lot. Agents noted that Aispuro had passed up two other entrances into the Sears Automotive lot before he eventually made the turn.

Once in the lot, Aispuro parked the Explorer and the individual who had been observed gesturing entered Aispuro's car. That individual was later identified as Carlos Labastida-Gayton. While inside the Explorer, Labastida-Gayton appeared to hand a small object to Aispuro before both men exited the car. Aispuro then walked to a nearby silver Jeep Cherokee, which agents learned was a rental vehicle from Enterprise Rental.[4] Labastida-Gayton joined two other men who were standing in the parking lot, later identified as Defendant Humberto Roman Hernandez and Manual Hurtado Miranda, and the three of them entered a black Jeep Wrangler. Aispuro left the parking lot in the silver Jeep Cherokee. He was again followed by agents, while other agents continued observation of the Explorer left parked in the Sears Automotive lot.

---

[4]Special Agent Gannelli testified that based on his training and experience he believed narcotics traffickers use rental vehicles as a way of mitigating financial liability and criminal detection. Gannelli also testified to his belief that narcotics traffickers typically meet in public locations for security reasons.

Aispuro drove the silver Jeep Cherokee back towards the 3401 N. Nordica address. At approximately 1:23 p.m., he parked the Cherokee near the corner of Cornelia and Sayre, about one block northeast of 3401 N. Nordica. After parking on the street, he exited the vehicle and started walking toward 3401 N. Nordica. Agents lost sight of Aispuro as he was walking, and they resumed surveillance of 3401 N. Nordica. Agents noted that street parking was available directly in front of 3401 N. Nordica.

Shortly thereafter, agents observed an unidentified Hispanic male carrying a heavy bag exit 3401 N. Nordica and enter the green Monte Carlo parked out front. Agents attempted to follow the Monte Carlo, but were unsuccessful because the driver conducted a series of unusual driving maneuvers, including driving extremely slowly and making four right turns. Agents concluded that such tactics were counter-surveillance measures. When they could no longer follow the Monte Carlo, the agents returned to 3401 N. Nordica. Immediately the agents observed that the silver Jeep Cherokee was no longer parked at Cornelia and Sayre. At this point, the agents ceased surveillance on Nordica and headed back toward the Sears Automotive lot to join the other agents stationed there.

One of the agents who had remained in the lot saw the black Jeep Wrangler previously observed heading northbound on Harlem Avenue with two individuals in the car. The agents also observed the same silver Jeep Cherokee as before traveling northbound on Harlem, observing that now the Cherokee was being driven by Hernandez. The agents testified that it appeared the two vehicles were being driven "in concert" when they both turned eastbound on Irving Park Road. Agents then stopped both vehicles.

4

Agent Asselborn approached the driver of the silver Jeep Cherokee and asked for identification. Hernandez provided his Mexican identification. After a short exchange, Hernandez consented to a search of the Cherokee. Hernandez was removed from the Cherokee and taken to the rear of the car near Agent Brian O'Neill. Agent Asselborn searched the Cherokee and found a duffle bag and backpack that contained in total twelve kilograms of cocaine, wrapped in children's clothing. At that point Hernandez was arrested. Hernandez told agents that he had received the key to the vehicle from a Hispanic male wearing a red jacket and blue jeans.

After discovering the twelve kilograms of cocaine and learning that a man matching Aispuro's attire had provided Hernandez with the key to the Cherokee, the agents returned to the area on Nordica where they had last seen Aispuro. Agents observed Aispuro walking from the north toward 3401 N. Nordica and enter that address. A few minutes later Aispuro exited 3401 N. Nordica and entered the white Ford Explorer. As Aispuro was driving away, and while he was in between the two Nordica addresses, Agents Asselborn and Gannelli stopped his vehicle. When it appeared that Aispuro did not understand English, the agents requested the aide of a Spanish speaking interpreter. While they were waiting for the interpreter to arrive, the agents removed Aispuro from the Explorer, patted him down, handcuffed him, and moved him to an area about a block east and out of sight of the Nordica addresses.

Very shortly thereafter Agent Williams, who speaks Spanish, arrived at the scene. Agent Williams conversed with Aispuro and provided Aispuro his constitutional rights. When asked where he lived, Aispuro responded 3401 N. Nordica. Agent Williams asked Aispuro for consent to search that address, to which Aispuro agreed. When Agent Williams read aloud to Aispuro

the consent to search form, Aispuro expressed a concern that there were some rooms in the house

that were rented out to tenants and that he did not want to be responsible for what was found in

those rooms.  Williams instructed Aispuro to write his concerns down on the form.  As translated

by a certified court reporter, Aispuro wrote on the form, "The room that someone is renting I do

not take responsibility for nor for what they find in the house."  A few minutes later Williams

asked Aispuro for his consent to search the garage at 3601 N. Nordica.  Aispuro again consented,

this time writing on the form (as translated), "I do not take responsibility for what they find in the

garage."  A search of 3401 N. Nordica revealed 124 kilograms of cocaine and $170,000 in cash.

In the garage of 3601 N. Nordica, agents found another three kilograms of cocaine.  Thereafter,

Aispuro was arrested.

## II.     Standing for Defendant Hernandez

As a threshold issue, the government contends that Defendant Humberto Roman

Hernandez lacks standing to challenge the search of the silver Jeep Cherokee.

To determine whether Hernandez has standing to challenge the search of the rental

vehicle he was driving, he must demonstrate that he had a legitimate expectation of privacy in the

area searched or the items seized.  *Rakas v. Illinois*, 439 U.S. 128 (1978).  To assess this

legitimate expectation, I apply a two-pronged test, essentially asking whether there is both a

subjective and an objective right to privacy.  *U.S. v. Haywood*, 324 F.3d 514, 515-16 (7th Cir.

2003).  The subjective prong of the test requires Hernandez to show that he "actually and

subjectively" held an expectation of privacy.  *U.S. v. Torres*, 32 F.3d 225, 230 (7th Cir. 1994).  I

find that Hernandez has sufficiently demonstrated a subjective expectation of privacy in the

silver Jeep Cherokee and the duffel bag therein.  He was handed a set of working keys for the

vehicle and no evidence was presented that the vehicle appeared stolen. The duffle bag was closed, opaque, and placed in the back seat of the silver Jeep Cherokee. The question, then, is whether Hernandez's expectation is one that society recognizes as legitimate and reasonable. *Haywood*, 324 F.3d at 514.

The Seventh Circuit has made clear that persons listed as authorized drivers on a rental agreement have standing to challenge the search of the rented vehicle. *U.S. v Walker*, 237 F.3d 845, 849 (7th Cir. 2001). A different issue, though, is presented when the driver is not listed on the rental agreement. Circuit courts that have examined the issue have not reached a consensus. The Fifth, Eighth, and Ninth Circuits have held that an unauthorized driver of a rental car has standing as long as the authorized driver has given him permission to drive the car. *See United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir. 1990); *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998)[5]; *United States v. Thomas*, 447 F.3d 1191 (9th Cir. 2006). The Fourth, Tenth, and Eleventh Circuits, on the other hand, have adopted a bright line rule that only looks to the rental agreement, holding that a driver who is not authorized by the rental company to operate the car does not have standing. *See United States v. Wellons*, 32 F.3d 117 (4th Cir 1994); *United States v. Roper*, 918 F.2d 885 (10th Cir. 1990); *United States v. McCulley*, 673 F.2d 346 (11th Cir. 1982). The Sixth Circuit has adopted a middle ground approach by creating a presumption that

---

[5]In *Best*, the Eighth Circuit noted, without deciding, that an unauthorized driver of a rental vehicle would have standing if the renter of the vehicle had granted the driver permission to use the vehicle. The district court did not rule on standing, instead leaving the record open on that issue. The defendant was driving a vehicle rented by his friend, but the district court did not make a factual determination as to whether the defendant had permission from his friend to use the car. Thus, the court of appeals remanded the case for a factual determination as to whether or not the defendant had permission, and as a result, standing to challenge the search. 135 F.3d at 1225.

an unauthorized driver does not have standing, but allowing this presumption to be overcome in light of all the surrounding circumstances. *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001) (finding presumption overcome for a driver who was licensed, married to the authorized driver, granted permission from the authorized driver, in possession of the rental agreement, and, most significantly who had called the rental company to reserve the vehicle with his credit card number, which was billed).

In *Haywood*, the Seventh Circuit broached the circuit split but refused to "decide which, if any, of the other circuits' rules or presumptions makes the most sense" because in addition to being an unauthorized driver, Haywood was an unlicensed one. 324 F.3d at 516. As a result, Haywood's expectation of privacy was unreasonable, and the court denied standing on that reason alone. *Id.*

Hernandez urges me to adopt the position of a Ninth Circuit case that stated "[a]n authorized driver may have standing to challenge a search if he or she has received permission to use the car" because Hernandez received permission to use the car from Aispuro. *Thomas*, 447 F.3d at 1199. But, that case does not grant standing when permission is given by just anyone. The very next sentence of the opinion reads, "Thomas, an unauthorized driver, only has standing to challenge the search of a rental automobile if he received permission to use the rental car *from the authorized renter*." *Id.* (emphasis added). Thus, the Ninth Circuit case is unhelpful to Hernandez, who only received permission to drive the silver Jeep Cherokee from Aispuro, who himself was not an authorized driver on the rental agreement. The authorized name on the rental

agreement is Guadalupe Valdivia.[6] No evidence was presented that Hernandez has any relationship to, or even knows, Valdivia.[7] A distinction must be made between a driver who receives permission to drive a rented vehicle from a person listed on the rental agreement and one who receives permission from another unauthorized person. The latter is the situation presented here. Even if I were to adopt the reasoning of those circuits which only require permission from an authorized driver, and not specific authorization from the rental company, Hernandez's argument for standing still fails. Like the court in *Haywood*, I need not decide which, if any, of the circuit court rules regarding drivers of rental vehicles makes the most sense. Hernandez received permission to drive the rented silver Jeep Cherokee from an individual also not listed on the rental agreement, and thus his argument fails under any of the competing approaches. Hernandez's relationship to the rental vehicle is simply too attenuated to support a claim of standing to challenge the search. Therefore, Hernandez's motion to suppress the twelve kilograms of cocaine found in the back of the silver Jeep Cherokee is denied.

## III.    Investigatory Stop of the White Ford Explorer

Aispuro argues that he was under unlawful arrest almost immediately after the agents approached his vehicle, and, alternatively that the agents did not have reasonable suspicion to conduct a *Terry* stop. He also argues that if the encounter was a *Terry* stop, it evolved into an arrest when he was ordered out of his vehicle, placed in handcuffs, and temporarily detained

---

[6]The Enterprise rental agreement further provides "NO OTHER DRIVER PERMITTED[.]"

[7]Nothing in the record provides any further information about Valdivia or her relationship to any of the defendants in this case.

inside a police vehicle. The government argues that the encounter with Aispuro was an investigatory stop that never converted into an arrest.[8]

The Fourth Amendment protects people from unreasonable searches and seizures. *See* U.S. Const. amend. IV. That said, a brief investigatory stop that demands only a limited intrusion into an individual's privacy is permitted under the Constitution when it is based upon "specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (*quoting Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Agents may therefore "conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Lawshea*, 461 F.3d 857, 859 (7th 2006). Reasonable suspicion amounts to something less than probable cause but more than a hunch. *Baskin* at 791. The existence of reasonable suspicion depends on the facts known to the agents at the time the stop is made, not at the moment the agents decide to make the stop. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).[9] In forming their suspicions, agents are "entitled to assess the circumstances and the defendants' behavior in light of [their own] experience" and "knowledge of drug courier activity." *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996). Although "innocent explanations" may exist for "individual factors taken separately, reasonable suspicion may arise when the factors are considered together." *United States v. Figueroa-Espana*, 511 F.3d 696, 703-04 (7th Cir. 2007); *but see Florida v. Royer*, 460 U.S. 491, 512 (1983) (facts considered individually or collectively

---

[8]The government further argues that the agents had probable cause to believe Aispuro was involved in criminal activity. However, because I find that the agents conducted an investigative stop, which never converted into an arrest, I do not reach a conclusion on this issue.

[9]*Beck* involved the issue of whether or not the officers had probable cause, as opposed to reasonable suspicion, but the temporal requirements are the same.

were found perfectly consistent with innocent behavior and could not possibly have given rise to any inference supporting a reasonable suspicion of criminal activity) (Brennan, J., concurring). Indeed, in analyzing the reasonableness of the agents' suspicions, I must look to the totality of the circumstances. *United States v. Teslim*, 869 F.2d 316, 322 (7th Cir. 1989).

I have no difficulty concluding that the agents had at least reasonable suspicion to justify a *Terry* stop of Aispuro. At the time, agents were aware of specific articulable facts which more than reasonably warranted suspicion that Aispuro was involved in drug trafficking. They had observed Aispuro's unusual driving when he seemed to be unclear about where he was going on his way to meet Labastida-Gayton in the Sears Automotive lot. After a semi-hidden exchange between these two in the white Ford Explorer, Aispuro entered into a rented silver Jeep Cherokee and drove it back to the vicinity of 3401 N. Nordica. He did not park right near the address, however, choosing instead to park a short distance away. Later, the agents observed a man leaving 3401 N. Nordica carrying a heavy bag and employing counter-surveillance tactics as he drove away. Agents observed Aispuro enter and exit that same address several times earlier that day. Unlike in *Royer*, the government in this case relies on more than the proposition that the agents made these random observations of behavior consisting of arguably innocent conduct that - when viewed in light of training and experience - led them to believe criminal activity was afoot. Significantly, the agents obtained specific information regarding drug trafficking at 3401 N. Nordica prior to November 28, 2006 and learned from Hernandez prior to the stop of Aispuro that a Hispanic male matching Aispuro's attire provided Hernandez with the key to the Cherokee, from which the agents recovered twelve kilograms of cocaine. Based on the pattern of conduct observed throughout the day, and in light of the information obtained by the DEA prior to the surveillance, it was reasonable for the agents to infer that Aispuro played a role in carrying out

11

the drug transaction that resulted in twelve kilograms of cocaine placed in the Jeep Cherokee. In light of the totality of circumstances, the agents' suspicions were reasonable in making the stop.

With regard to whether or not the *Terry* stop ever converted into an arrest, the testimony of the agents from the suppression hearing makes clear that Aispuro was detained and moved a short distance away from where he was initially stopped in order for the detention to be out of sight from the Nordica addresses. The purpose of keeping out of sight was admittedly twofold: to protect the agents as well as to avoid compromising the ongoing investigation. And although the distinction between an investigative detention and an arrest is flexible and highly fact-intensive, [t]he permissible scope of a *Terry* stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars." *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004). In cases like this one, the risk to officer safety cannot be understated. *United States v. DeBerry*, 76 F.3d 884, 885 (7th Cir. 1996) ("Self-defense is the original rationale of the *Terry* stop . . . and still the most compelling justification for it."). In *Vega*, the Seventh Circuit held that a *Terry* stop did not become an arrest when officers drew their weapons and detained a suspect in a squad car for over an hour. *United States v. Vega*, 72 F.3d 507 (7th Cir. 1995) (noting the officers believed the suspect was dangerous due to his involvement in a massive cocaine conspiracy).

The facts here similarly do not warrant a finding that the investigative stop converted into an arrest. Under the circumstances, it was not unreasonable for the agents to remove Aispuro from his vehicle, place him in handcuffs, and detain him in a squad car a short distance away from the stop. Only moments prior to the stop, Aispuro was observed exiting an address linked to drug trafficking, and that address was in plain view of the location of the stop. The agents needed a safe place to have an opportunity to search both Aispuro and his vehicle for weapons

12

and to wait for the Spanish interpreter to arrive. They also wanted to ensure that individuals who may have remained at either of the Nordica addresses were unaware that Aispuro had been stopped. Such knowledge would surely have jeopardized the ongoing investigation into the narcotics trafficking associated with those locations. Based on all of the observations throughout the day, including the facts that (1) Aispuro was seen driving the silver Jeep Cherokee from which 12 kilograms of cocaine were just recovered, and (2) a man wearing matching attire to Aispuro gave Hernandez the key to the Cherokee, the agents had a reasonable fear for their safety and were within their authority to conduct their investigative search in a safe place. Thus, not only were the agents justified at the inception in stopping Aispuro, the circumstances as they unfolded did not convert the stop into an arrest.

## IV. Consent to Search 3401 N. Nordica and Garage at 3601 N. Nordica

Finally, Aispuro argues that he did not knowingly consent to the search of his residence at 3401 N. Nordica nor to the search of the garage at 3601 N. Nordica.

Consensual searches are permitted under the Fourth Amendment. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). However, the consent of a defendant to search his house, vehicle, or other property must be knowingly and intelligently given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973). In a case such as this, where the government relies upon consent to justify the lawfulness of a search, the government carries the burden to prove that consent was in fact freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Showing a mere submission to a claim of lawful authority does not satisfy this burden. *Royer*, 460 U.S. at 497.

First, Aispuro argues that he signed the consent forms under the duress of the agents' threats against him and his family. This claim is not supported by evidence in the record. Second, Aispuro argues that the agents knowingly deceived him by allowing him to believe that

if he consented to the search he would not be charged for any of the items found within the residence or garage. Essentially, Aispuro argues that the consent given was not voluntary under the required standards. Aispuro claims that he negotiated the terms of the consent and only agreed to the search in exchange for the express promise that any contraband would not be attributed to him. At the very least, he argues, there was no meeting of the minds with regard to a central term, namely Aispuro's so-called "conditional consent."

While this is a clever attempt to avoid the damaging repercussions of his consent, it is to no avail. "Negotiation" of terms regarding the consent never took place. Aispuro expressed concerns to Agent Williams about what would be found pursuant to the search. Agent Williams instructed Aispuro to write those concerns on the form and he did. No promises or assurances were made by the agents that Aispuro would not be held accountable for the fruits of the search. Nothing in the record indicates that the agents were acting in bad faith nor that they wrongfully perpetuated Aispuro's mistaken belief. To the contrary, Agent Williams provided the Spanish interpretation Aispuro required in order to understand his constitutional rights as well as the implications of the consent form he signed.

Significantly, neither of Aispuro's written disclaimers limits the *scope* of the area to be searched. *See Jimeno*, 500 U.S. at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents."). Rather, through those disclaimers Aispuro attempted to limit the legal ramifications of whatever was to be found as a result of the search. Even if I assume that when Aispuro wrote the disclaimers he believed by doing so he was getting out of being thought to have possession of whatever was found, would this destroy the validity of his consent? I think not. Enabling an individual to reduce the ambit of the use of evidence against him - to essentially remove the legal consequences of his actions - would undermine the

14

ability of law enforcement to "meet the practical demands of effective criminal investigation."

*See Ker v. California*, 374 U.S. 23, 34 (1963) (quotation omitted). It is clear from what Aispuro

wrote on the consent forms that he understood exactly what the agents were requesting and that

he knowingly consented to the searches. His concern over culpability, which is not addressed by

the motions presented here, is distinct from the issue of consent.

**V.      Conclusion**

For the foregoing reasons, Hernandez's Motion to Quash Arrest and Suppress Evidence is

denied. Aispuro's Motion to Quash Arrest and Suppress Evidence is similarly denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: May 2, 2008